**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William Edward ReBROOK, III,**
**Defendant–Appellant.**

**No. 94–5125.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 3, 1994.

Decided June 30, 1995.

**ARGUED:** Arthur Thomas Ciccarello, Sr., Ciccarello, Del Guidice & Lafon, Charleston, WV, for appellant. Hunter P. Smith, Jr., Asst. U.S. Atty., Charleston, WV, for appellee. **ON BRIEF:** George A. Daugherty, Elkview, WV, for appellant. Rebecca A. Betts, U.S. Atty., Larry R. Ellis, Asst. U.S. Atty., Charleston, WV, for appellee.

Before LUTTIG and WILLIAMS, Circuit Judges, and MacKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part and reversed in part by published opinion. Judge WILLIAMS wrote the opinion, in which Judge LUTTIG and Senior Judge MacKENZIE joined.

## OPINION

WILLIAMS, Circuit Judge:

William Edward ReBrook, III, appeals his convictions and sentence for wire fraud, 18 U.S.C. §§ 1343, 1346, and securities fraud, 15 U.S.C. §§ 78ff, 78j(b). ReBrook presents four issues on appeal. First, he argues that both of the counts as charged against him are legally infirm and should not have been allowed to go to the jury. Second, ReBrook argues that the district court erred in excluding certain newspaper articles as inadmissible hearsay. Third, because he had been the target of pervasive adverse publicity unrelated to the case, ReBrook argues that the district court erred in failing to grant him individual voir dire. Fourth, ReBrook argues that the district court erred in enhancing his sentence pursuant to U.S.S.G. § 2C1.7(b)(1)(B) (1993) as an "official holding a high-level decision-making or sensitive position." We reverse ReBrook's conviction for securities fraud, but affirm his conviction and sentence for wire fraud.

### I.

This criminal proceeding arises from financial dealings relating to the introduction of video lottery machines in the State of West Virginia. In June of 1990, the West Virginia Lottery Commission (the "Lottery Commission") began testing video lottery machines at a single horse racing track in West Virginia. By February of 1992, a number of competing companies in the gaming equipment business, anticipating an expansion of video lottery machines, attempted to gain a stronghold in the West Virginia video gaming market.

In April of 1990, the new Director of the Lottery Commission, Elton "Butch" Bryan, hired ReBrook to serve as the commission's attorney. The position included a variety of responsibilities, such as providing legal advice to the Lottery Commission and its Director, giving political advice to the Director, and reviewing and drafting documents for the Lottery Commission. The job was part-time and paid a salary of up to $25,000 per year.

According to the evidence presented at trial, the general elections for statewide political offices in the autumn of 1992 were to have a direct effect on the expansion of the video gaming market in West Virginia. It was the Government's theory at trial that, from a date early in 1992, ReBrook had knowledge of the Governor's undisclosed plans to allow a statewide expansion of the video lottery immediately following the general election. In particular, Bryan testified at trial that at various points he told ReBrook of conversations that he had with Governor Gaston Caperton concerning the expansion of the video lottery.[1]

Bryan passed on to ReBrook even more sensitive information than that of a general plan for expansion of the video lottery: Bryan informed ReBrook of the selection process by which the contract was to be awarded and, most importantly, which company Bryan intended to win the contract. Bryan testified that at some point in early 1992 he had decided, as the Director of the Lottery Commission, that when the video lottery was expanded, the Lottery Commis-

---

1. The Government also entered into evidence a tape-recorded conversation between ReBrook and Bernard Folio, a local political figure. In that conversation, ReBrook repeatedly stated to Folio that the Governor of West Virginia was going to allow the expansion of the video lottery "the day after the [1992] general election." (J.A. 191.)

sion would award what is commonly referred to as a "sole source" contract to one of the competing gaming companies. A sole source contract, in the context of this case, means that the company to which the contract to expand the video lottery was awarded would be responsible for providing all of the machines and services to the state and would receive approximately $25 million in gross revenues. Most importantly, Bryan testified that before the general election he told ReBrook—despite rules providing for the unbiased awarding of such contracts—that the Lottery Commission would award the sole source contract to a company named Video Lottery Consultants, Inc. ("VLC").

As the attorney for the Lottery Commission, ReBrook learned additional information concerning VLC and other video lottery competitors. For example, on or about September 23, 1992, Bryan discussed the status of VLC with the company's chief executive officer. That officer told Bryan that the stock's value had dropped approximately 50% in price over the preceding two weeks due to adverse administrative rulings in Australia where VLC also conducted business and that the stock's value would not be dropping any further. This information was not made public by VLC. ReBrook learned of the contents of Bryan's telephone call that same day from either Bryan himself or Jim Moran, an employee with a competing video lottery company.

On September 24, 1992, ReBrook used all his available funds to purchase 100 shares of VLC stock, valued at $14.25 per share. Furthermore, ReBrook passed on the information he learned about the financial health of VLC to two friends who then purchased an additional 6,000 shares of VLC stock in their names. Following his purchase of VLC stock, ReBrook continued to represent the Lottery Commission without informing the Lottery Commission that he owned stock in VLC or that he stood to benefit substantially from the contemplated expansion of video

lottery through a single source contract awarded to VLC.

On June 17, 1993, a federal grand jury in Charleston, West Virginia, returned a two-count indictment against ReBrook. Count 1 of the indictment charged ReBrook with wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. Count 2 of the indictment charged him with securities fraud in violation of 15 U.S.C. §§ 78ff and 78j(b), and 17 C.F.R. § 240.10b–5.

Before proceeding to trial, ReBrook filed a motion to dismiss the indictment, challenging the validity of both counts for wire fraud and securities fraud. The district court denied the motion. *United States v. ReBrook,* 837 F.Supp. 162 (S.D. W. Va.1993). On November 5, 1993, a jury convicted ReBrook on both counts. ReBrook filed a posttrial motion challenging the jury's verdict on a number of grounds, including the manner in which the district court conducted voir dire of the jury and certain evidentiary rulings, which the district court denied. *United States v. ReBrook,* 842 F.Supp. 891 (S.D. W. Va.1994). On February 7, 1994, the district court sentenced ReBrook under the federal sentencing guidelines to 27–month sentences on each count, to run concurrently.

ReBrook now appeals various rulings of the district court, including the validity of both counts in the indictment, the pretrial voir dire, certain evidentiary rulings, and his sentencing.

## II.

ReBrook first challenges the district court's decision, as a matter of law, to allow each of the two counts in the indictment to go forward to trial. ReBrook focuses his challenge primarily on the securities fraud conviction under Count 2, arguing that the district court erred in allowing the Government to prosecute him under a "misappropriation theory" of securities fraud. As to Count 1, ReBrook maintains that his conviction for wire fraud must also be reversed because the impermissible securities fraud allegation was the only ground upon which the jury could have based a guilty verdict on the wire fraud count. While we conclude

that ReBrook's conviction and sentence for securities fraud must be reversed because of our decision not to adopt the misappropriation theory in this Circuit, we affirm the district court's decision to allow the wire fraud charge to be presented to the jury.

### A.

█ Count 2 charges ReBrook with securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b) and 78ff, and Rule 10b–5, 17 C.F.R. § 240.10b–5.[2] As in the companion case of *United States v. Bryan*, 58 F.3d 933 (4th Cir.1995), the Government bases the securities fraud count upon what is commonly referred to as the "misappropriation theory" of insider trading, not on any theory of tippee liability. *See United States v. Chestman*, 947 F.2d 551 (2d Cir.1991) (en banc), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992); *SEC v. Cherif*, 933 F.2d 403 (7th Cir.1991), *cert. denied*, 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992); *SEC v. Clark*, 915 F.2d 439 (9th Cir.1990); *United States v. Newman*, 664 F.2d 12 (2d Cir.1981), *aff'd after remand*, 722 F.2d 729 (2d Cir.1983), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).[3] "Under this theory, a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence

and uses that information in a securities transaction." *Chestman*, 947 F.2d at 566. ReBrook maintains that this Circuit should not adopt the misappropriation theory in this case.

We recently rejected application in this Circuit of the precise misappropriation theory on which ReBrook's conviction was based, in *Bryan*, 58 F.3d at 943–59. The *Bryan* case involved the prosecution of the Director of the Lottery Commission, Elton "Butch" Bryan, the same person who played a prominent role in ReBrook's case as a witness for the prosecution. Although the scope of Bryan's criminal activities were arguably broader than those of ReBrook, the prosecution of Bryan for securities fraud focused, in large part, on similar facts to those of Re-Brook: Bryan's September 1992 purchase of shares in VLC stock soon after the decision had been made to select VLC as the single source supplier of video lottery machines for the state's upcoming lottery expansion. We summarized our position on the misappropriation theory in *Bryan* as follows:

> We conclude that neither the language of section 10(b), Rule 10b–5, the Supreme Court authority interpreting these provisions, nor the purposes of these securities fraud prohibitions, will support convictions resting on the particular theory of misappropriation adopted by our sister circuits. Section 10(b), insofar as concerns us, ... prohibits only the use of deception, in the form of material misrepresentations or

---

**2.** Section 10(b) provides, in relevant part:

It shall be unlawful for any person, directly or indirectly ...

(b) To use or employ, in connection with the purchase or sale of any security[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the SEC pursuant to section 10(b), provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce

(a) [t]o employ any device, scheme, or artifice to defraud, [or]

(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**3.** The Supreme Court has yet to rule on the validity of the misappropriation theory. In *Carpenter v. United States*, 484 U.S. 19, 24, 108 S.Ct. 316, 319–20, 98 L.Ed.2d 275 (1987), the Court was evenly divided on the validity of a securities fraud conviction based on this doctrine and, accordingly, affirmed the lower court without further comment.

omissions, to induce action or inaction by purchasers or sellers of securities, or that affects others with a vested interest in a securities transaction. In contravention of this established principle, the misappropriation theory authorizes criminal conviction for simple breaches of fiduciary duty and similar relationships of trust and confidence, whether or not the breaches entail deception within the meaning of section 10(b) and whether or not the parties wronged by the breaches were purchasers or sellers of securities, or otherwise connected with or interested in the purchase or sale of securities. Finding no authority for such an expansion of securities fraud liability—indeed, finding the theory irreconcilable with applicable Supreme Court precedent—we reject application of the theory in this circuit.

*Bryan,* 58 F.3d at 944.

 Our straightforward reasoning in *Bryan* is equally applicable to ReBrook. As the excerpted portion of *Bryan* makes clear, we have rejected the misappropriation theory as envisioned by our sister circuits in whole, not simply as applied to the particular facts in *Bryan.* In short, under *Bryan,* we limit our inquiry to whether ReBrook used "deception, in the form of material misrepresentations or omissions, to induce action or inaction by purchasers or sellers of securities, or that affects others with a vested interest in a securities transaction." *Id.* at 944. Here, ReBrook simply took advantage of the information to which he was privy as the Lottery Commission's attorney in September of 1992 to purchase shares in VLC stock—the same action taken by Bryan. Accordingly, we apply the reasoning and holding in *Bryan* concerning the misappropriation theory to conclude that ReBrook's conviction for securities fraud violations must be reversed.

**B.**

 Next, we turn to ReBrook's challenge to Count 1 of the indictment for committing wire fraud in violation of 18 U.S.C. §§ 1343, 1346. In order to convict ReBrook for wire fraud in violation of 18 U.S.C.A. § 1343 (West Supp.1995),[4] the Government must prove: "1) a scheme to defraud and 2) the use of a wire communication in furtherance of that scheme." *United States v. Brandon,* 50 F.3d 464, 467 (7th Cir.1995). Additionally, under 18 U.S.C. § 1346 (1988), "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In this case, the Government alleged that ReBrook schemed to defraud the citizens of the State of West Virginia of his honest and faithful services as the attorney for the Lottery Commission, and that he traded on confidential information.[5]

ReBrook's entire argument challenging the legal validity of his wire fraud conviction under Count I of the indictment is presented in the following portion of his brief on appeal:

> Because the theory under which appellant was convicted of insider trading does not emerge from the statute, SEC Rule 10b–5, or any authoritative judicial gloss, the conviction for insider trading is invalid. *U.S. Const.* Art. 1, § 9. Accordingly, *the wire fraud conviction for defrauding the citizens of West Virginia of appellant's honest services based on the predicate act of insider trading is also invalid.*

(Brief of Appellant at 8) (emphasis added). Because ReBrook fails to explain this statement to any extent, we are left somewhat puzzled as to its exact meaning. Giving ReBrook the benefit of the doubt, however, we interpret his argument to contend that be-

---

**4.** 18 U.S.C.A. § 1343 states, in relevant part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or arti-

fice, shall be fined under this title or imprisoned not more than five years, or both.

**5.** The Government alleged in the indictment that ReBrook owed the citizens of West Virginia a general duty of honest and good government based upon (1) attorney ethical obligations under the Model Rules of Professional Conduct, and (2) the West Virginia Governmental Ethics Act, Chapter 6B of the West Virginia Code.

cause we reverse his securities fraud conviction, we must also reverse the wire fraud conviction on the ground that the two counts share the same underlying facts and form the basis for both crimes.[6]

■ We disagree with ReBrook's interpretation of the wire fraud statute and its relation to securities fraud statutes. Granted, a number of the underlying facts used to prove the securities fraud were also used to prove the wire fraud. However, the two crimes are distinct and require the government to prove different elements in order to secure a conviction. *See Carpenter v. United States*, 484 U.S. 19, 28, 108 S.Ct. 316, 321–22, 98 L.Ed.2d 275 (1987) (while dividing evenly on the misappropriation theory, the Court independently held that confidential information is "property," the deprivation of which can constitute both mail and wire fraud). Furthermore, a distinction between the two counts is also supported by the holdings of various courts that there is no multiplicity issue when prosecuting the same purchase or sale of securities under both the securities fraud statute and the wire fraud statute. *United States v. Faulhaber*, 929 F.2d 16, 19 (1st Cir.1991); *United States v. Reed*, 639 F.2d 896, 905 (2d Cir.1981). Because the wire fraud count stands independently of the securities fraud count in this case, we con-

clude that ReBrook's conviction for wire fraud must be affirmed.[7]

### III.

■ ReBrook argues next that the district court erred in refusing to admit into evidence a variety of newspaper articles. We review the district court's evidentiary ruling with substantial deference and will not disturb that decision absent a clear abuse of discretion. *United States v. Russell*, 971 F.2d 1098, 1104 (4th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993). At trial, counsel for ReBrook indicated that he had approximately 455 newspaper articles which would demonstrate that plans for expansion of the video lottery system were not confidential. ReBrook argues that the district court abused its discretion by ruling that the newspaper articles were inadmissible hearsay when, in fact, he was attempting to use the articles solely to establish what information was available in the public domain. ReBrook theorizes that the district court's exclusion of the newspaper articles in question made it impossible for trial counsel to make an effective argument concerning (1) a lack of "materiality" required for a securities fraud prosecution or

---

6. We do not understand ReBrook to be making the same argument concerning his wire fraud conviction that Bryan makes concerning his mail fraud conviction in *Bryan*. In that case, Bryan argued that "the evidence was insufficient to support [Bryan's] convictions under these [mail fraud] provisions [18 U.S.C. §§ 1341, 1346] because 'there was no evidence that [he] violated any law, statute or binding regulation in his conduct with respect to the ... video lottery contract.'" *Bryan*, 58 F.3d at 940 (quoting Appellant Bryan's Brief at 11–12). After an extended discussion, we rejected this argument on the ground that "[w]e see no reason [ ] to read into the mail fraud statute an independent criminal violation requirement when the fraud conviction is based on the deprivation of the right to intangible services as opposed to the deprivation of property or money, as in *Carpenter*." *Id.* at 941.

ReBrook's argument appears to be more narrow than that of Bryan, focusing on the interrelated nature of the securities fraud and wire fraud prosecutions rather than on whether a violation of the wire fraud statute requires the violation of some law or regulation other than

the wire fraud statute itself. We note, however, that to the extent ReBrook puts forward the same argument as Bryan, our reasoning concerning the mail fraud statute in *Bryan* is equally applicable in this case for the wire fraud statute. *Carpenter*, 484 U.S. at 25 n. 6, 108 S.Ct. at 320 n. 6; *see also Belt v. United States*, 868 F.2d 1208, 1211 (11th Cir.1989) ("The wire fraud statute tracks the language of the mail fraud statute, 18 U.S.C. § 1341 [counterfeiting]. The statutes are given a similar construction and are subject to the same substantive analysis.").

7. We stress that, from our reading of his brief, ReBrook's appeal concerning the wire fraud count is narrow in scope. For example, ReBrook does not challenge 18 U.S.C. § 1346, which defines a "scheme or artifice to defraud" under the wire fraud statute as including the deprivation of "another of the intangible rights of government," as being unconstitutionally vague. *ReBrook*, 837 F.Supp. at 171. Furthermore, ReBrook does not challenge the sufficiency of the evidence to support his conviction on the wire fraud charge.

(2) a lack of a plan to defraud the state of his honest governmental services.[8]

A close review of the record indicates no abuse of discretion in the manner in which the district court ruled on the use of the newspaper articles. Instead, the record indicates the district court fully understood the hearsay nature of the newspaper articles, and was, if anything, trying to observe the fine line between the permissible use of the articles to demonstrate general public knowledge and the impermissible use of the articles, as conceded by ReBrook at trial, to prove the factual matters asserted therein.

During ReBrook's direct examination, his counsel attempted to discuss the 455 newspaper articles brought by ReBrook to trial. ReBrook was asked to testify specifically about one newspaper article relating to the public's knowledge of Lottery Commission plans to expand video lottery machines following the gubernatorial election. The Government objected and the district court upheld the objection on the grounds that there was a lack of foundation and a failure by ReBrook's counsel to fit the articles within an exception to the hearsay rule.[9] Counsel for ReBrook made clear to the district court that he did not seek to admit the articles into evidence due to hearsay problems, but instead simply wanted to use the articles to show public knowledge of the lottery expansion. After some false starts, counsel for ReBrook focused specifically on a single article, written by Richard Grimes, concerning the intentions of the Lottery Commission and the Governor following the general election. When ReBrook began to testify about his knowledge of the newspaper reporter's background in reporting state politics, the district court interrupted as follows:

> There is an awful lot of background information being given here if it's not offered ... for the truth of the matters asserted. If you want to call Mr. Grimes [the newspaper reporter], you can call Mr. Grimes, *or you can make a brief reference to this article.*

(J.A. 504) (emphasis added). The record indicates that counsel for ReBrook elected the latter option of making brief reference to the article for the purpose of demonstrating a general public knowledge of the expansion, because later in the direct examination concerning the article, the district court overruled the Government's repeated objection for lack of foundation and hearsay.[10] With

8. ReBrook's argument concerning the use of the newspaper articles primarily focuses on the relation of the articles to the securities fraud count. Because we are reversing ReBrook's securities fraud conviction on other grounds, there is no need to review ReBrook's arguments concerning the district court's ruling as it relates to the securities fraud allegation. Accordingly, we review ReBrook's arguments to the extent they touch upon the wire fraud conviction.

9. The record states:

[Prosecutor]: Objection, Your Honor. I object to references to specific articles on the grounds of relevancy until such a foundation has been shown. I also object on the basis of hearsay. We do not object to the authenticity that those are actual copies of newspaper articles, but we do object to the relevance, we do object on the basis of hearsay.
The Court: There is a lack of foundation at this point, I will sustain. I have to sustain the objection on hearsay until you show me there is some exception.
[ReBrook's Counsel]: Your Honor, I am trying to show the state of mind of this defendant at the time that the conversation took place, and he said it was based upon—
The Court: You have to put these articles in ... an appropriate time frame.

(J.A. 502.)

10. In fact, the record indicates the district court made additional efforts to help ReBrook make simple references to the article regarding its existence and relation to the underlying events in question:

[ReBrook's Counsel]: And was [the expansion plans for video lottery to bars, ski lodges, and truck stops] a matter of some publication also in the newspapers prior to 1992.
[Prosecutor]: Same objections I have made earlier, Your Honor. Relevancy, lack of foundation regarding time frame, hearsay, object on all those grounds.
The Court: Well, I'll overrule on this question.
[ReBrook's Counsel]: All right.
[ReBrook]: Every place that I told Mr. Folio— every place that I told Mr. Folio there would be video lottery machines had been printed in the Charleston newspapers months or years prior to me talking to him.
The Court: I'll point out the answer was not responsive to the question. The question was, was that a matter that had been the subject of articles. That calls for a yes or no answer.
[ReBrook]: The answer is yes.

(J.A. 505.)

this single newspaper article discussed before the jury over the Government's objection, counsel for ReBrook decided, for whatever reason, to move on to other matters.[11]

In short, our review of the record indicates that the district court understood the purpose for which ReBrook sought to use the newspaper articles. In fact, the record reveals extended efforts by the district court to aid counsel in moving forward precisely on such a basis. However, counsel for ReBrook appears to have made a trial strategy decision to address other subjects rather than further pursue the newspaper articles. In distinguishing between the hearsay and non-hearsay implications of the articles and requiring counsel to lay a proper foundation for the articles, the district court did not abuse its discretion in its evidentiary rulings.

### IV.

ReBrook next argues that the district court erred in denying his motion to allow his counsel individually to voir dire potential jurors. This Court has repeatedly made clear that the district court has broad discretion in the conduct of voir dire and will be reversed only for an abuse of discretion. *United States v. Bakker,* 925 F.2d 728, 733 (4th Cir.1991). Where the defendant fails specifically to object to the manner in which the district court conducted voir dire, as here, we review the issue for plain error affecting substantial rights. *United States v. La-Rouche,* 896 F.2d 815, 829 (4th Cir.), *cert. denied* 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *see also United States v. Koon,* 34 F.3d 1416, 1442–43 (9th Cir.1994) (citing *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993)), *petition for cert. filed,* 63 U.S.L.W. 3756 (U.S. Apr. 10, 1995) (No. 94–1664).

ReBrook maintains that it was necessary for his counsel to question directly the potential jurors because, prior to trial, ReBrook was the target of pervasive adverse publicity unrelated to the case: allegations in local newspapers reported that ReBrook had demanded that some women clients have sexual intercourse with him in return for his legal services. ReBrook argues that when a defendant has been the target of sensational bad publicity (as he has) on matters unrelated to that for which he would be tried, it is plain error to refuse direct voir dire by defendant's counsel. Otherwise, ReBrook argues that the jury selection process may somehow permit an inference of actual prejudice.

Without determining whether substantial rights were at issue below, we conclude that the district court did not err in conducting voir dire of the potential jurors. At ReBrook's request, the district court specifically asked whether any potential juror was aware of any publicity surrounding ReBrook's campaign for attorney general, ReBrook's personal or private life, or Bryan's criminal trial. As the district court made clear in its order denying ReBrook's post-trial motion:

> The Court questioned individually the potential jurors whose responses proved less than satisfactory [to the above-stated matters], providing them the opportunity to speak to the Court and counsel privately. This voir dire procedure was specifically approved by the Fourth Circuit in *Bakker,* 925 F.2d at 734.

*ReBrook,* 842 F.Supp. at 893. We fully agree with the district court and discern no errors in the court's handling of voir dire. Therefore, we affirm the district court on this issue.

### V.

Finally, ReBrook appeals the district court's decision to increase his sentence for wire fraud because he was an "official holding a high-level decision-making or sensitive position," pursuant to U.S.S.G. § 2C1.7(b)(1)(B). Because this question turns primarily on fact, we review the district court's application of § 2C1.7(b)(1)(B) under the clearly erroneous standard. *United States v. Daughtrey,* 874 F.2d 213, 217–18 (4th Cir.1989) (where issue turns primarily on factual determinations, the appellate court should apply "clearly erroneous" standard);

---

**11.** Specifically, counsel for ReBrook turned to ReBrook's purchase of the VLC stock and whether ReBrook had the intent to violate the ethics code of West Virginia in making that purchase.

*see also United States v. Matzkin*, 14 F.3d 1014, 1021 (4th Cir.1994) (applying clearly erroneous standard to application of U.S.S.G. § 2C1.1(b)(2)(B), which provides offense level increase for payment made to influence any official in a high level decisionmaking or sensitive position).

A conviction for fraud involving deprivation of the intangible right to the honest services of public officials brings with it a base offense level of 10. U.S.S.G. § 2C1.7(a). The district court may increase the base offense level where the following specific offense characteristic is present:

> If the offense involved an elected official or *any official holding a high-level decisionmaking or sensitive position*, increase by 8 levels.

U.S.S.G. § 2C1.7(b)(1)(B) (emphasis added). Because ReBrook was appointed to his position as attorney for the Lottery Commission, the district court focused on whether ReBrook held "a high-level decision-making or sensitive position."

ReBrook argues that the overall nature of his job as attorney for the Lottery Commission precludes the application of § 2C1.7(b)(1)(B). Specifically, ReBrook points out that he earned only $25,000 per year, he had no office or parking space at the Lottery Commission, and had no secretary serving him at the Lottery Commission. ReBrook maintains that he was simply a part-time lawyer for the Lottery Commission who advised its director as to the law and performed miscellaneous duties when asked to do so for the Lottery Commission. ReBrook reasons that the part-time nature of the job, combined with the lack of various perquisites, means that he did not hold either a

high-level decision-making or sensitive position.

We disagree. At sentencing, the district court found ReBrook held a sensitive position within the meaning of § 2C1.1(b)(1)(B) based upon the nature of the advice ReBrook gave to the Director of the Lottery Commission, the influence that ReBrook had with other Lottery Commission members as shown by testimony concerning a Lottery Commission report on the expansion of the video lottery system, and the fact that ReBrook was privy to confidential information as an attorney for the director.[12] Other than generally denying the implication of these findings, ReBrook has done nothing on appeal to cast a different light on the findings. As ReBrook has failed to present any basis for finding the district court's decision under § 2C1.7(b)(1)(B) to be clearly erroneous, we affirm the district court's sentencing of ReBrook.

## VI.

ReBrook's conviction and sentence for securities fraud are reversed. ReBrook's conviction and sentence for wire fraud, however, are hereby affirmed.

*AFFIRMED IN PART, REVERSED IN PART.*

---

**12.** After taking argument, the district court offered the following, lucid analysis:

> I overrule the objection of the defense to the eight point enhancement pursuant to § 2C1.7(b)(1)(B). The offense, in the Court's opinion here, involved an official holding a high level sensitive position which would require the increase of eight levels.
> I would agree with defense counsel that not every attorney would qualify as being in a sensitive position. I believe that the de facto situation here requires the Court to hold that the position was sensitive in relation to Mr. ReBrook's particular advice that he gave to the

director, Mr. Bryan, and the influence that he had with other of the commission members, as witness the testimony of Mr. Giambrone, in the matters having to do with the committee report on the video lottery matter. Mr. ReBrook, because of his special relationship here had—was privy to particular information both as an attorney and as a friend and confidant to the high level supervisory official, Mr. Bryan, and I think that the evidence is ample here to conclude that he held a sensitive position in the facts and circumstances of this particular case, so I do overrule the objection. (J.A. 610.)