IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-41147
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE LUIS SNELL,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Texas

_____

August 19, 1998

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Jose Luis Snell solicited a bribe to deliver a "not guilty" verdict from the jury on which he served. He was then prosecuted and stands convicted by his guilty plea. He appeals only his sentence. He argues that the district court erroneously applied a sentencing enhancement for bribery of a "government official" in a "high-level decision-making or sensitive position" under U.S.S.G. § 2C1.1(b)(2)(B). Because we agree that a juror falls within this provision, we affirm.

Snell served as a juror in the trial of <u>United States v. Alejandro Gudino-Vara & Ruben Anselmo Zea-Luna</u>, CR No. M-96-198, in federal district court in the Southern District of Texas. The defendants in that case were accused of conspiracy to possess approximately 113 kilograms of marijuana with the intent to distribute it.

During the trial, Snell approached members of the defendants' families, suggesting that they contact him. When they did not do so, he approached again, telling Gudino-Vara's wife that he could "make the others also be in favor; there are 5 or 6 of us." He met with three family members that evening in Reynosa, Mexico, to discuss a payment in exchange for delivering a "not guilty" verdict. He requested $18,000 for his efforts, but agreed to accept $10,000 up front and $8,000 upon delivery of the favorable verdict. He received the $10,000 later that night.

Snell persuaded the other jurors to select him as foreman. Despite Snell's efforts, the other jurors favored a guilty verdict almost immediately. He nevertheless held out for a "not guilty" verdict, protracting the jury deliberations. Snell finally gave up when other jury members asked him whether "he had been paid off or

if someone had gotten to him."[1]  The jury delivered a verdict of guilty for both defendants.

Shortly after the trial, the family members contacted Snell. It should not have surprised Snell that they wanted their money back.  Snell, however, returned only $3,000, while claiming that he had spent the rest to bribe other jury members.  This would not do. So, the family members went to the Federal Bureau of Investigation. Ultimately, they agreed to cooperate with the government in exchange for immunity.  In a series of taped conversations, Snell described the previous events.  Furthermore, and apparently trying to redeem his failure to deliver a not guilty verdict, he discussed the possibility of bribing the judge or probation officer to achieve lesser sentences for the defendants.  With this evidence in the hands of the prosecutors, Snell was indicted for bribery under 18 U.S.C. § 201(b)(2)(A).  He later pleaded guilty and was duly sentenced.  He appeals his sentence.

## II

The district court determined Snell's sentence by applying U.S.S.G. § 2C1.1, which deals with bribery of a person, such as a public official, for a corrupt purpose.  The court began with the required base offense level of ten, see § 2C1.1(a), and added two

---

[1]One of the jurors also informed law enforcement officers that Snell had been observed approaching the defendants' family members during the trial.

levels because the offense involved more than one bribe, see § 2C1.1(b)(1). The court then added eight levels because the offense involved a "payment for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position . . . ." § 2C1.1(b)(2)(B). Snell challenges this last enhancement.

A

In reviewing sentences under the sentencing guidelines, we examine a district court's factual findings only for clear error and afford great deference to the court's application of the guidelines to those facts. United States v. Tomblin, 46 F.3d 1369, 1391 (5th Cir. 1995). Factual questions, such as the discretion, supervisory authority, and other indicia of responsibility of an official, are not at issue in this case, however. The question whether a juror is an official holding a high-level decision-making or sensitive position, because it depends primarily upon interpretation of the sentencing guidelines, is a question of law that we review *de novo*. See United States v. Stephenson, 895 F.2d 867, 877 (2d Cir. 1990) (examining whether an "Export Licensing Officer" in the U.S. Department of Commerce held a "sensitive" position within the meaning of § 2C1.1(b)(2)(B)); see also United States v. Morris, 131 F.3d 1136, 1138 (5th Cir. 1997), cert. denied, 118 S.Ct. 1546 (1998).

4

B

(1)

Whether a juror is an "official holding a high-level decision-making or sensitive position" under section 2C1.1(b)(2)(B) of the Sentencing Guidelines is informed by the Application Notes. The note to section 2C1.1(b)(2)(B) lists, as examples of officials within its scope, "prosecuting attorneys, judges, agency administrators, supervisory law enforcement officers, and other governmental officials with similar levels of responsibility." U.S.S.G. § 2C1.1, comment. (n.1). There can be no doubt that, as a juror, Snell was acting as a government "official" for purposes of section 2C1.1. See 18 U.S.C. § 201(a)(1) (defining "public official" to include "a juror"). The question, therefore, is whether a juror holds a position with a level of responsibility similar to that held by officials listed in the Application Notes.

Snell argues that there are several critical differences in the level of responsibility between the examples provided in the Application Notes and a juror. The listed positions all involve officials with extended terms of service, who exercise a substantial amount of unilateral discretion and who possess supervisory powers of other government employees. A juror, Snell contends, plays no role in implementing governmental policy, has no power over other government employees, and has a term of service

5

limited to a single case. The government, on the other hand, argues that jurors play a crucial role in our justice system similar to judges and are, in fact, referred to as "judges" in pattern jury instructions. Thus, it maintains that the district court did not err in concluding that jurors are sufficiently analogous to judges so as to fall within the scope of section 2C1.1(b)(2)(B).

(2)

To determine the applicability of section 2C1.1(b)(2)(B), courts have focused on several indicia of high-level responsibility. One major consideration is the possession of supervisory authority over a significant group of other government employees. See, e.g., United States v. Gatling, 96 F.3d 1511, 1526 (D.C. Cir. 1996); United States v. Matzkin, 14 F.3d 1014, 1021 (4th Cir. 1994). Another important mark of high-level responsibility is the existence of discretion involving final decision-making authority over matters of public policy or over the expenditure of substantial sums of money. See, e.g., Tomblin, 46 F.3d at 1391; Matzkin, 14 F.3d at 1021; United States v. Lazarre, 14 F.3d 580, 582 (11th Cir. 1994); United State v. Gaines, 37 F.3d 1496, 1994 WL 567681, at *2 (4th Cir. 1994) (unpublished). Such discretion, however, is not always required, and courts have readily found an eight-level enhancement appropriate under section 2C1.1(b)(2)(B)

6

based on the official's ability to use his position to influence another in the exercise of such discretion.  See, e.g., United States v. ReBrock, 58 F.3d 961, 970 (4th Cir.), cert. denied, 516 U.S. 970 (1995); Tomblin, 46 F.3d at 1391.

Examining the role of a juror in our criminal justice system, some of these indicia of high-level responsibility are present. Although a juror does not alone possess final decision-making authority over the guilt or innocence of a criminal defendant, he does maintain the essentially absolute power to force a mistrial-- at least in the federal system, as in this case.  His discretion in this respect is virtually unchecked and, depending on the case, may result in the squander of substantial amounts of precious time and money in the form of both judicial and prosecutorial resources. Moreover, each juror is in a very potent position to influence the verdict.  Being isolated with fellow jurors for the sole purpose of arriving at a decision as to guilt or innocence, with the understanding that such deliberations may be continued for substantial periods of time until a final verdict is reached, the forceful or stubborn juror may wield remarkable influence.  Snell's position as jury foreman may have increased his ability to influence jury deliberations.  And apart from being in a position to persuade other jurors of his views, any single juror may also be able to exact concessions from the other jurors as to, for example,

7

convictions on lesser included offenses or sentences. <u>Cf., e.g.</u>, Susan Borreson, <u>Raw Deal Under New Rule?</u>, Texas Lawyer, June 22, 1998, at 1, 16 (story of jurors arriving at compromise verdict and sentence in Texas criminal case).

More profound than any of these considerations, however, is the tremendous responsibility every juror has with respect to the criminal justice system as a whole. The critical importance of neutral, law-respecting juries to our legal system cannot be gainsaid. "England, from whom the Western World has largely taken its concepts of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury." <u>Irvin v. Dowd</u>, 366 U.S. 717, 721 (1961); <u>see also, e.g.</u>, <u>Spaziano v. Florida</u>, 468 U.S. 447, 481 (1984) (Stevens, J., concurring in part) ("The authors of our federal and state constitutional guarantees uniformly recognized the special function of the jury in any exercise of plenary power over the life and liberty of the citizen."). From the Magna Carta, to the Declaration and Bill of Rights of 1689, to the Declaration of Independence, the importance of juries has been etched into our Anglo-American heritage. As our most respected legal commentators have observed:

> "[T]he founders of the English law have, with excellent forecast, contrived that . . . the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by

the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion."

Duncan v. Louisiana, 391 U.S. 145, 151-52 (1968) (quoting 4 William Blackstone, Commentaries on the Laws of England 349 (Cooley ed. 1898)). "In the ultimate analysis, only the jury can strip a man of his liberty or his life." Irvin, 366 U.S. at 722.

Because the jury trial is "essential for preventing miscarriages of justice and for assuring that fair trials are provided for all defendants," Duncan, 391 U.S. at 157-58, "it [is] obviously fundamental to fairness that [the right to] a 'jury' means [the right to] an 'impartial jury,'" id. at 181-82 (Harlan, J., dissenting). So fundamental is the unbiased jury to our nation's criminal justice system that the Framers provided the absolute right to an "impartial jury" in the Bill of Rights. See U.S. Const. amend. VI. In sum, it is apparent that the solemn responsibility of each and every juror to protect the integrity of our criminal justice system is, in fundamental ways, unsurpassed among the other offices of public service. Cf. Remmer v. United States, 347 U.S. 227, 229 (1954) ("The integrity of jury proceedings must not be jeopardized by unauthorized invasions."); Clark v. United States, 289 U.S. 1, 16 (1933) (Cardozo, J.) (speaking of the "overmastering need, so vital in our polity, of

preserving trial by jury in its purity against the inroads of corruption").

In view of the prominence of juries in our legal system, and of the extraordinary responsibility of every juror in preserving that system, we have little difficulty concluding that a juror, in the role assigned to him, shares a level of responsibility at least equal to a prosecuting attorney, agency administrator, or supervisory law enforcement officer, as they perform their respective roles. Snell's conduct as a juror in this case fell far short of the standard expected of those accepting such responsibility. Although he ultimately failed to convince eleven other jurors to undermine the integrity of the system, Snell's impotence does not exculpate him. The district court's decision to assess an eight-level enhancement for such misconduct was not error.

III

For the foregoing reasons, the district court's calculation of Snell's sentence is

A F F I R M E D.

10