# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3498

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EDUARD S. RENESLACIS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 1091—**James F. Holderman**, *Judge.*

———————

ARGUED MAY 29, 2003—DECIDED NOVEMBER 12, 2003

———————

Before CUDAHY, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Eduard Reneslacis was convicted after a jury trial for offering bribes to a public official and for making materially false statements to a public official. Reneslacis appeals, contending that the court (1) improperly increased his offense level for offering money to an official "holding a high-level decision-making or sensitive position" and (2) incorrectly found that he had led or organized the offense. We agree that the official whom Reneslacis attempted to bribe—a district-adjudications officer for the former Immigration and Naturalization Service (INS)—held a sensitive position, but do not think

that Reneslacis led or organized a scheme to bribe him. We therefore uphold the first adjustment but remand for resentencing as to the second.

## I. BACKGROUND

In 1998, federal officials started an investigation into the illegal sale of resident-alien cards and other documents establishing the right of foreigners to reside permanently in the United States. As part of the investigation, officials opened "GS Golden Travel," a store on the west side of Chicago that was advertised as a travel agency but conducted no legitimate business. The store was wired with surveillance equipment, and Clarence Robinson, a bonafide district-adjudications officer, posed there as a corrupt official who for $5,000 would approve applications for lawful permanent residency filed by immigrants who were ineligible for that status.

To become a permanent resident, ordinarily applicants must submit a sponsor's petition along with medical records, fingerprints, a $220 fee, and other paperwork. The applicant must then appear for an interview before a district-adjudications officer, who may grant or deny the application based upon criteria established by the INS (now a defunct agency, though we can ignore that detail). If the application is granted, the officer will affix a temporary stamp to the applicant's passport. Valid for one year, the stamp serves as proof of permanent-residency status until the applicant receives a resident-alien card (better known as a green card).

Reneslacis had overstayed his tourist visa, and in April 1999 he met with Gregory Sienkiewicz, a convicted felon who worked for the government by promoting Golden Travel to his former associates. Sienkiewicz told Reneslacis

that his immigration problems could be solved for $5,000 and that through the travel agency he could obtain work permits and social security cards for his friends. After returning to Golden Travel a few weeks later to meet with Robinson—who pointedly explained, "you know this is illegal, what we're doing right now"—Reneslacis accepted the proposal and that August paid $5,000 for a stamp in his passport signifying that he had successfully applied to become a permanent resident.

After his initial meeting at Golden Travel, Reneslacis also began referring potential customers to Robinson and Sienkiewicz. In July 1999, he went to the travel agency with a man named Przemek, who was interested in purchasing green cards and other paperwork for two of his friends. A few months later Reneslacis arrived with another man, Anguel, who wanted to buy permanent-residency status for himself and his wife until he learned that Robinson did not offer a "discount" for married couples and would require full payment from them both. In March 2000, Reneslacis took Yivgenia Korzun (and her translator) to see Robinson because she allegedly needed help with an application that had already been filed, and the following November Reneslacis told Robinson that he knew someone who would pay $25,000 to become a lawful permanent resident. Reneslacis also sent two faxes to Golden Travel, both of which were headed "2 New Clients" and contained names, social security numbers, and dates of birth for potential customers.

Of all these people, the government presented evidence that only Natalia Pavlikova—one of the clients listed in the faxes—actually paid money to Robinson. She supplied $12,000 to become a lawful permanent resident—$3,500 of which was kicked back to Reneslacis. The jury nevertheless found Reneslacis guilty on three bribery charges, concluding that he had offered money in connection with himself and Pavlikova as well as the unidentified client who was willing

to pay $25,000 for Robinson's services. The jury also found that Reneslacis lied to customs officials about where he had obtained the stamp in his passport.

At sentencing, the district court heard testimony only from Marilyn Roraff, a supervisor of district-adjudications officers, including Robinson, in Chicago. She explained that each of her officers annually handled more than 2,000 applications to become permanent residents—more than half of which were granted. Roraff testified that this case-load allowed her to review only applications that were denied (which in turn could be reviewed by an immigration judge and the Board of Immigration Appeals). Applications that were granted, she explained, crossed her desk "very rarely." She told the court that out of a hundred successful applications at most one would be brought to her attention—and then only because of an allegation of fraud or other misconduct warranting investigation.

Based on this testimony, and the Fourth Circuit's decision in *United States v. Gary*, No. 97-4718, 1998 WL 390855, at *1 (4th Cir. June 22, 1998) (unpublished)— which held that the lone district-adjudications officer in South Carolina occupied "a high-level decision-making or sensitive position" within the INS—the district court increased Reneslacis's offense level under U.S.S.G. § 2C1.1(b)(2)(B). The court also adjusted upward after finding that Reneslacis had led a scheme to bribe Robinson comprising of more than five participants. *Id.* § 3B1.1(a). In a ruling that is not contested, the court found that Reneslacis lied at his trial and imposed an additional adjustment for obstruction of justice. *Id.* § 3C1.1.

## II.  ANALYSIS

### A.  U.S.S.G. § 2C1.1(b)(2)(B)

On appeal, Reneslacis first contends that the district court improperly adjusted his offense level under U.S.S.G.

§ 2C1.1(b)(2)(B)—a provision of the sentencing guidelines that we have not yet considered. The guideline provides for an upward adjustment for attempting to influence important public officials: "If the offense involved a payment for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position, increase by 8 levels." Covered officials include judges, agency administrators, supervisory law enforcement officers, and anyone else with "similar levels of responsibility." *Id.*, cmt. n.1.

The district court ruled that district-adjudications officers like Robinson also deserve to be on this list, and the parties at the outset contest what respect should be given to that view. Because the adjustment requires "application of the guidelines to the facts," the district court's conclusion is entitled to "due deference." 18 U.S.C. § 3742(e); *Buford v. United States*, 532 U.S. 59, 63 (2001); *United States v. Gatling*, 96 F.3d 1511, 1525-26 (D.C. Cir. 1996). The courts of appeals have disagreed about how much deference (if any) is "due," taking a variety of approaches to the adjustment. *Compare United States v. Mack*, 159 F.3d 208, 220 (6th Cir. 1998) (factual question reviewed for clear error); *United States v. Toothman*, 137 F.3d 1393, 1398 n.10 (9th Cir. 1998) (same), *with United States v. Paradies*, 98 F.3d 1266, 1292 (11th Cir. 1996) (legal question reviewed de novo), *and United States v. Bynum*, 327 F.3d 986, 993 (9th Cir. 2003) ("interpretation" of the sentencing guidelines reviewed de novo); *United States v. Snell*, 152 F.3d 345, 346 (5th Cir. 1998) (same). We do not need to resolve the issue here. The result would be the same regardless of the standard of review. *See United States v. Purifoy*, 326 F.3d 879, 880 (7th Cir. 2003).

Reneslacis contends that the adjustment was improperly imposed because Robinson's position with the INS was neither "high-level" nor entailed policymaking. He concedes

that Robinson had *some* discretionary responsibilities within the agency but observes that this fact alone does not justify the adjustment. *See United States v. Stephenson*, 895 F.2d 867, 878 (2d Cir. 1990). Positions to which the adjustment has been applied, Reneslacis insists, have additional hallmarks of authority. Covered officials, for example, typically supervise other employees, *e.g.*, *Gatling*, 96 F.3d at 1526 (head of Section 8 housing); *United States v. Matzkin*, 14 F.3d 1014, 1021 (4th Cir. 1994) (supervisory naval engineer), make public policy, *see United States v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 975-76 (D.C. Cir. 1998) (Secretary of Agriculture), stand in the shoes of a policymaker, *United States v. Tomblin*, 46 F.3d 1369, 1391 (5th Cir. 1995) (top aide to a U.S. senator), or influence policymakers, *United States v. ReBrook*, 58 F.3d 961, 970 (4th Cir. 1995) (attorney for the state's lottery commission).

Reneslacis rightly observes that Robinson did not possess any of these qualities. As a district-adjudications officer, he occupied the first level of intake for applicants seeking to change their immigration status. He did not supervise other employees or establish immigration policy but instead made decisions largely by checking applicants' qualifications against predetermined criteria. And although he was at level 12 on the government's pay scale, others in his position started at level 5—the same level as office assistants, records keepers, and other support staff within the agency.

But by focusing on Robinson's spot in the hierarchy of INS officials, Reneslacis has neglected a second ground for imposing the adjustment. Section 2C1.1(b)(2)(B) refers not only to "high-level" officials but also to officials who hold "sensitive" positions. The Fifth Circuit accordingly has held that bribing a juror in a criminal case warrants a sentencing bump. *Snell*, 152 F.3d at 346-48. Although jurors serve for only brief periods and have no policymaking or

supervisory power, *Snell* explains that they nevertheless have substantial influence over individual trials and "extraordinary responsibility" for the health of the country's legal system. *Id.* at 348.

Likewise, although Robinson did not have a particularly lofty position within the INS, he did hold a sensitive post. Because only a handful of his decisions were ever reviewed, he had near total control over who could become a permanent resident and eventually a U.S. citizen. Several courts have held that possessing unreviewed power over important public decisions reflects a sensitive post—even if existing rules dictate how those decisions should be made. *E.g.*, *Gatling*, 96 F.3d at 1526; *United States v. Lazarre*, 14 F.3d 580, 582 (11th Cir. 1994). Given that Robinson also could subpoena witnesses, take testimony, and perform other quasi-judicial functions, *see* U.S.S.G. § 2C1.1(b)(2)(B), cmt. n.1. (bribing a judge will support the adjustment), and that one court has concluded in an unpublished opinion that bribing a district-adjudications officer justifies a § 2C1.1(b)(2)(B) adjustment, *Gary*, 1998 WL 390855, at *1,[1] we think that the district court acted properly here.

## B. Aggravating Role

Reneslacis also challenges the district court's adjustment for his role in the offense. The sentencing guidelines authorize a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The government must establish that the ad-

---

[1] The Fourth Circuit permits citation to unpublished opinions when no other decision "would serve as well." 4th Cir. R. App. P. 36(c).

justment is warranted by a preponderance of the evidence, *United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001), and our review of the court's ruling is only for clear error, *United States v. Souffront*, 338 F.3d 809, 833 (7th Cir. 2003).

Like the parties, we begin with whether the bribery operation at Golden Travel had five or more participants or was "otherwise extensive." All agree that Reneslacis and Pavlikova participated because they both paid Robinson to become permanent residents. *See* U.S.S.G. § 3B1.1, cmt. n.1 ("participants" include anyone criminally responsible for committing the offense regardless of whether they were convicted); *see also United States v. Fleischli*, 305 F.3d 643, 659 (7th Cir. 2002). But finding three other culpable parties is not as easy. Robinson and Sienkiewicz were working undercover for the government, so they do not count. U.S.S.G. § 3B1.1, cmt. n.1; *see also United States v. Andreas*, 216 F.3d 645, 679 (7th Cir. 2000). And there is no evidence that Reneslacis referred anyone other than Pavlikova to Golden Travel who actually gave Robinson money.

Nevertheless, the district court could infer participation by Przemek, Anguel, and the unidentified client who was willing to pay $25,000. Although none of these people handed over any cash, the record suggests that they expressed the ability and desire to pay, and no more is required. *United States v. Rasco*, 853 F.2d 501, 505 (7th Cir. 1988). The recorded conversations of Przemek's visit to Golden Travel show that he wanted to know where to direct "the moolah" for his friends—a sign that he was ready and able to pay on their behalf. Anguel likewise was plainly interested in bribing Robinson until he learned that he and his wife would not receive a discount. *See United States v. Synowiec*, 333 F.3d 786, 790 (7th Cir. 2003) (agreement over the amount of a bribe is not essential); *see also United*

*States v. Jacobs*, 431 F.2d 754, 760 (2d Cir. 1970). And the offer made by the unidentified client to pay $25,000 formed one of the counts of conviction, which Reneslacis does not challenge.

Still, we ultimately need not decide whether the numerosity requirement has been satisfied because the government has not shown that Reneslacis led or organized anyone in the offense. To see this problem, it is important to recognize that "leaders" and "organizers" may play different roles. As the First Circuit has explained, leaders ordinarily exercise control over subordinates in a hierarchy; organizers, on the other hand, do not necessarily control anyone but nonetheless influence the criminal activity by coordinating its members. *United States v. Tejada-Beltran*, 50 F.3d 105, 112 (1st Cir. 1995); *see also United States v. Barnes*, 117 F.3d 328, 337 (7th Cir. 1997) (noting that control over others *or* organizational responsibility is required); *United States v. Fones*, 51 F.3d 663, 670 & n.5 (7th Cir. 1995) (same).

There is no evidence that Reneslacis acted as a leader. Everyone whom he brought to Golden Travel was his customer, not a subordinate under his control. *See United States v. Mustread*, 42 F.3d 1097, 1104-05 (7th Cir. 1994); *United States v. McGuire*, 957 F.2d 310, 316 (7th Cir. 1992) (customers are not "employees" or "subordinates"). True, Reneslacis in one recorded conversation conceded that "most of the clients come through someone else" and Przemek, at least, went to Golden Travel on behalf of two other people. But these facts do not show that the "someone else" or Przemek worked for Reneslacis, and without evidence that he had authority over another person involved in the offense, he cannot have been a leader.

That leaves the possibility that Reneslacis acted as an organizer. This characterization would be plausible if the

government had demonstrated that Reneslacis was working with others toward a common criminal objective. In *Tejada-Beltran*, for example, the defendant smuggled immigrants into the United States using a team of people who recruited the clients, doctored their passports, and paid immigration officials to look the other way when the clients passed through customs. The First Circuit held that the adjustment was warranted because the defendant had formed "diverse elements into a whole consisting of interdependent, coordinated parts, geared for concerted action." 50 F.3d at 113.

Here, however, everyone whom Reneslacis worked with had their own agenda. Each of his clients wanted immigration papers for themselves (or, in Przemek's case, for two of his friends), making it impossible to say that Reneslacis was organizing them for *concerted* action. As Reneslacis rightly observes, by referring immigrants who wanted to become permanent residents to Golden Travel—with the expectation that he would receive a portion of the bribes—his role was the same as a broker in a drug case who is compensated for referring an addict to a dealer. We have held that narcotics brokers do not deserve a four-level adjustment under § 3B1.1(a). *E.g.*, *United States v. Schuh*, 289 F.3d 968, 973 (7th Cir. 2002). There is no reason to treat Reneslacis differently here.

### III.  CONCLUSION

For the foregoing reasons, the sentence is VACATED, and the case is REMANDED for resentencing consistent with this opinion.

No. 02-3498                                                    11

A true Copy:

 Teste:

        _____
        *Clerk of the United States Court of*
        *Appeals for the Seventh Circuit*