**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1463
_____

UNITED STATES OF AMERICA

v.

ANTOINETTE ADAIR,
            Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:16-cr-00259-001)
District Judge:  Honorable Mark R. Hornak
_____

Argued: April 28, 2021
_____

Before:  SMITH, *Chief Judge*,[*] PHIPPS, and ROTH, *Circuit
Judges*.

(Filed: June 30, 2022)
_____

---

[*] Judge Smith was Chief Judge when this appeal was argued.
Judge Smith completed his term as Chief Judge and assumed
senior status on December 4, 2021.

Donovan J. Cocas [**ARGUED**]
Laura S. Irwin
UNITED STATES ATTORNEY'S OFFICE
WESTERN DISTRICT OF PENNSYLVANIA
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
	*Counsel for United States of America*

Julie A. McGrain [**ARGUED**]
OFFICE OF FEDERAL PUBLIC DEFENDER
DISTRICT OF NEW JERSEY
800-840 Cooper Street, Suite 350
Camden, NJ 08102
	*Counsel for Antoinette Adair*

_____

OPINION OF THE COURT
_____

**PHIPPS**, *Circuit Judge.*

For several years, Antoinette Adair pushed pills in Pittsburgh. She was arrested and later pleaded guilty to a ten-count indictment for her role in illegally distributing prescription painkillers. In calculating Adair's sentence, the District Court increased her offense level by four points for being an organizer or leader of extensive criminal activity. *See* U.S.S.G. § 3B1.1(a). And although Adair timely pleaded guilty, the government did not move for a one-point reduction for acceptance of responsibility. *See id.* § 3E1.1(b). Accounting for those and other sentencing factors, the District Court calculated the range for Adair's imprisonment under the Sentencing Guidelines as between 188 and 235 months. The District Court then granted a downward variance so that Adair received a 168-month prison term for the longest of her concurrent sentences.

2

In this appeal, Adair disputes the initial Guidelines range for her imprisonment. She argues that the District Court erred by applying a four-point increase for the organizer-leader enhancement. She also contends that the District Court should have compelled the government to move for a one-point reduction for acceptance of responsibility. For the reasons below, we will affirm the District Court's judgment of sentence.

## BACKGROUND

Adair gained access to prescription opiate pills as a treatment for back pain. A physician prescribed her 300 opioid pills per month (240 oxycodone and 60 oxymorphone), and she became addicted.

Despite her addiction, Adair recognized that a broader market existed for prescription pills. She convinced her mother and her sister to obtain opiate painkillers from the same physician. After that doctor pleaded guilty to illegally distributing controlled substances in 2012, Adair found other physicians who would overprescribe opioid pills.

For the next several years, Adair participated in and coordinated transactions for prescription pills. At one point, she had twelve people in her network of suppliers who would obtain prescriptions and acquire opioid pills. Adair coordinated the distribution and sale of those pills to addicts, including herself, as well as to a drug dealer who oversaw a much larger pill-distribution network. She decided when and where sales would occur, and she had oversight over her suppliers, referring to some of them as her sons. She also made drug deliveries herself, occasionally with one of her buyers serving as a chauffeur and bodyguard.

Adair was also adept at responding to the vicissitudes of the prescription-pill black market. With respect to the drug dealer who oversaw a larger pill network, she would, when necessary, front him pills or provide extra pills for free when he could not

3

afford to purchase her full supply. When he needed a new gun, she offered to find him one. Adair also demonstrated responsiveness and flexibility with her addict clients. She would arrange for them to buy from other drug dealers when she had no pills for them. Similarly, she advised one of her suppliers on whether to report a gun offered as collateral for drugs as stolen. But she accommodated only so much: on one occasion, Adair threatened and pointed a gun at a confidential informant for shorting her the amount owed for pills.

After her arrest in December 2016, Adair's pill-distribution operation came to an end. In January 2018, she pleaded guilty to a ten-count indictment for violating multiple federal statutes: 18 U.S.C. § 1347 (health care fraud); 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance); *id.* § 841(b)(1)(C) (possession with intent to distribute oxymorphone and oxycodone); *id.* § 846 (conspiracy to distribute oxycodone and oxymorphone). *See* 18 U.S.C. § 3231 (conferring jurisdiction to the district courts in cases involving "offenses against the laws of the United States"). She did so without entering into a plea agreement with the government, and they disagreed over several aspects of her sentence calculation.

After briefing and a two-day hearing, the District Court fixed the Guidelines range for Adair between 188 and 235 months' imprisonment. That calculation included a four-point increase in the offense level for the organizer-leader enhancement. *See* U.S.S.G. § 3B1.1(a). Also, although the District Court subtracted two points from Adair's offense level for her acceptance of responsibility, *see id.* § 3E1.1(a), the government did not move for a third-point acceptance-of-responsibility reduction for her timely notice of her guilty plea, *see id.* § 3E1.1(b).

Ultimately, the District Court varied downward from that Guidelines range. Due to her personal opioid addiction and post-plea rehabilitation, the District Court sentenced her to 168

4

months' imprisonment.  Adair timely appealed that sentence, bringing this matter within this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291; *see also* 18 U.S.C. § 3742(a); *United States v. Bell*, 947 F.3d 49, 53 (3d Cir. 2020).

## DISCUSSION

Adair disputes the District Court's calculation of her Guidelines range on two grounds.  She argues first that the District Court miscalculated that range by increasing her offense level by four points for being an organizer or leader of extensive criminal activity under Guideline § 3B1.1(a).  Next, she contends that the District Court erred by not compelling the government to move for a third-point reduction for acceptance of responsibility under Guideline § 3E1.1(b) after she provided timely notice of her intention to plead guilty.  For the reasons below, neither challenge succeeds.

### I.  The Organizer-Leader Enhancement in Guideline § 3B1.1(a)

The application of the organizer-leader enhancement hinges upon the meaning of the terms 'organizer' and 'leader' as used in Guideline § 3B1.1.  Because the United States Sentencing Commission has interpreted these terms in its commentary, the weight afforded to that commentary may affect the meaning of those terms.  Those legal issues receive *de novo* review.  *See United States v. Nasir*, 17 F.4th 459, 468 (3d Cir. 2021) (en banc).  Review of the District Court's factual findings in support of the organizer-leader enhancement proceeds under the clear error standard because Adair preserved this challenge.  *See United States v. Huynh*, 884 F.3d 160, 165 (3d Cir. 2018).

### A.  The *Stinson* Paradigm and *Auer* Deference

The Supreme Court has established a general paradigm for the relationship between the Sentencing Guidelines and the Commission's interpretive commentary.  Under that paradigm, formulated in *Stinson v. United States*, 508 U.S. 36 (1993),

5

Guidelines drafted by the Commission are treated as legislative rules,[1] and the Commission's comments interpreting the Guidelines are viewed as interpretive rules.[2] The paradigm applies only to the Commission's interpretive commentary, not its commentary related to either background information or circumstances that may warrant a departure from a guideline. *Compare id.* (applying the paradigm only to interpretive commentary), *with* U.S.S.G. § 1B1.7 (describing three different types of commentary to the Guidelines).

---

[1] The term 'legislative rule' generally refers to an agency rule promulgated through formal or informal (notice-and-comment) rulemaking, although certain subject-matter exceptions exist. *See* 5 U.S.C. § 556–57 (setting forth procedures for formal rulemaking); *id.* § 553(c) (establishing procedures for informal rulemaking); *see also id.* § 553(a)(1)–(2) (allowing for rules on certain topics without the need for formal or informal rulemaking). In *Stinson*, the Supreme Court recognized that Sentencing Guidelines could be analogized to legislative rules because both are promulgated "by virtue of an express congressional delegation of authority for rulemaking . . . and through the informal rulemaking procedures." *Stinson*, 508 U.S. at 44–45.

[2] To qualify as an interpretive rule, a rule must "derive a proposition from an existing document whose meaning compels or logically justifies the proposition." *Cath. Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010) (quoting Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules, and "Spurious" Rules: Lifting the Smog*, 8 Admin. L.J. Am. U. 1, 6 n.21 (1994)); *see also* 5 U.S.C. § 553(b)(3)(A) (exempting interpretive rules from the rulemaking procedures). After considering the "functional purpose of [the] commentary," the Supreme Court determined that the Commission's interpretive commentary of the Guidelines operated much like an agency's interpretive rule for its own legislative rules. *Stinson*, 508 U.S. at 45.

The *Stinson* paradigm provides only half of the framework for analyzing the Commission's interpretive commentary; the other half requires determining the weight that such commentary should receive. When the Supreme Court decided *Stinson*, an agency's interpretation of its own legislative rule received *Seminole Rock* deference, later known as *Auer* deference. *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945); *Auer v. Robbins*, 519 U.S. 452 (1997). Such deference gave controlling weight to an agency's interpretation of its own regulation unless the interpretation was "plainly erroneous or inconsistent with the regulation." *Stinson*, 508 U.S. at 45 (quoting *Seminole Rock*, 325 U.S. at 414); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 110 (2015) (Scalia, J., concurring in judgment) ("Interpretive rules that command deference *do* have the force of law."). Thus, the application of *Auer* deference within the *Stinson* paradigm required courts to defer to the Commission's commentary for a Guideline unless that interpretation was plainly erroneous or inconsistent with the Guideline. *See Stinson*, 508 U.S. at 47; *see also* U.S.S.G. § 1B1.7, Commentary.

Although the *Stinson* paradigm has not changed, the Supreme Court reprised *Auer* deference in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). That decision made clear that for *Auer* deference to apply, "a court must exhaust all the 'traditional tools' of construction," *id.* at 2415 (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council Inc.*, 467 U.S. 837, 843 n.9 (1984)), and determine that the regulation is "genuinely ambiguous," *id*. at 2414. Under this approach, a court must consider the "text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* at 2415.

*Kisor* did more than render *Auer* deference "a doctrine of desperation." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 454 (1987) (Scalia, J., concurring in the judgment) (opining that *Chevron* deference should not be "a doctrine of desperation"). In addition, before affording controlling deference to an

agency's interpretation of a genuinely ambiguous regulation, a court must make an "independent inquiry" into the "character and context" of the reasonable interpretations of the regulation, *i.e.*, those within the "zone of ambiguity." *Kisor*, 139 S. Ct. at 2416. As guideposts, the Supreme Court identified three character-and-context circumstances in which an agency's otherwise reasonable interpretation should not receive controlling weight. *See id.* at 2416–17. Those occur when an agency's interpretation is not its "'authoritative' or 'official position,'" *id.* (quoting *United States v. Mead Corp.*, 553 U.S. 218, 257 (2001) (Scalia, J., dissenting)), when the agency's interpretation does not implicate its "substantive expertise" in some way, *id.* at 2417, and when the agency's reading does not reflect its "fair and considered judgment" but rather is a "convenient litigating position," a "*post hoc* rationalization," *id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (alteration omitted)), or a parroting of a federal statute, *see id.* at 2417 n.5 (citing *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006)). In sum, under *Kisor*, a genuine ambiguity in an agency's regulation is necessary for *Auer* deference, but it is not sufficient: the character and context of an agency interpretation that falls within the regulation's zone of ambiguity must also counsel in favor of deference. *Kisor*, 139 S. Ct. at 2415–18.

After *Kisor*, this Court, sitting en banc, unanimously concluded that the reprised standard for *Auer* deference applied to the Commission's interpretive commentary. *See Nasir*, 17 F.4th at 470–71. With that new understanding, prior caselaw that had afforded *Auer* deference to the Commission's interpretive commentary without engaging in the *Kisor* process does not automatically retain its controlling force. *See id.* Rather, to remain binding, such a decision must have (presciently) complied with the *Kisor* process: a genuine-ambiguity analysis followed by an independent evaluation of the character and context of the agency's interpretation, provided that the agency's interpretation falls within the Guideline's zone of ambiguity. *See id.* at 471–72.

8

Because the Commission promulgated Guideline § 3B1.1(a), the *Stinson* paradigm applies. But the District Court, which sentenced Adair before the *Nasir* decision, did not follow the *Kisor* process as *Nasir* now requires before consideration of the interpretive commentary to determine the meaning of a Guideline.[3] As explained below, however, had the District Court properly done so, it would have reached the same outcome, and therefore that legal error was harmless. *See generally* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *see also United States v. Jenkins*, 333 F.3d 151, 153 (3d Cir. 2003) (applying the principle that a judgment may be affirmed for any ground supported by the record to a criminal conviction when the law governing that judgment had been changed by intervening precedent).

### B.  A Post-*Kisor*, Post-*Nasir* Interpretation of the Organizer-Leader Enhancement in Guideline § 3B1.1(a)

Before *Kisor* and *Nasir*, this Court had interpreted the organizer-leader enhancement in Guideline § 3B1.1(a) on several occasions.[4] Those cases all, in some way, deferred to

---

[3] *Nasir* does not prevent courts from considering the other forms of commentary – background commentary or commentary regarding a departure from a guideline – or other resources from the Commission in imposing a sentence. *See Nasir*, 17 F.4th at 470–71; *see also* U.S.S.G. § 1B1.7 (describing three types of commentary to the Guidelines). *Nasir* applied the *Kisor* process only to the use of the Commission's interpretive commentary as a tool to determine the meaning of a Guideline. *See Nasir*, 17 F.4th at 470–71; *see also Stinson*, 508 U.S. at 45.

[4] *See United States v. Jarmon*, 14 F.4th 268 (3d Cir. 2021); *United States v. Raia*, 993 F.3d 185 (3d Cir. 2021); *United States v. Williams*, 974 F.3d 320 (3d Cir. 2020); *United States*

9

the Commission's interpretive commentary, which treated organizers and leaders interchangeably and used a multi-factor test to determine the applicability of the enhancement.[5] *See*

*v. Huynh*, 884 F.3d 160 (3d Cir. 2018); *United States v. Fountain*, 792 F.3d 310 (3d Cir. 2015); *United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009); *United States v. Barrie*, 267 F.3d 220 (3d Cir. 2001); *United States v. Helbling*, 209 F.3d 226 (3d Cir. 2000); *United States v. Bass*, 54 F.3d 125 (3d Cir. 1995); *United States v. Katora*, 981 F.2d 1398 (3d Cir. 1992); *United States v. Belletiere*, 971 F.2d 961 (3d Cir. 1992); *United States v. Phillips*, 959 F.2d 1187 (3d Cir. 1992); *United States v. Ortiz*, 878 F.2d 125 (3d Cir. 1989); *see also United States v. Chau*, 293 F.3d 96 (3d Cir. 2002) (interpreting the terms 'organizer,' 'leader,' 'manager', and 'supervisor' as used in § 3B1.1(c)); *United States v. Bethancourt*, 65 F.3d 1074 (3d Cir. 1995) (same); *United States v. Felton*, 55 F.3d 861 (3d Cir. 1995) (same).

[5] *See Jarmon*, 14 F.4th at 275 (relying on a case that relies on the commentary); *Raia*, 993 F.3d at 191–92 (relying on the commentary and other cases that rely on the commentary); *Williams*, 974 F.3d at 376 (relying on the commentary); *Huynh*, 884 F.3d at 170 (relying on the commentary and other cases that rely on the commentary); *Fountain*, 792 F.3d at 321 (relying on a case that relies on the commentary); *Starnes*, 583 F.3d at 216–17 (relying on the commentary and a case that relies on the commentary); *Barrie*, 267 F.3d at 223 (relying on the commentary); *Helbling*, 209 F.3d at 243 (relying on the commentary and other cases that rely on the commentary); *Bass*, 54 F.3d at 128–29 (same); *Katora*, 981 F.2d at 1402–05 (same); *Belletiere*, 971 F.2d at 969–72 (same); *Phillips*, 959 F.2d at 1191–92 (relying on cases that rely on the commentary); *Ortiz*, 878 F.2d at 127 (relying on the commentary); *see also Chau*, 293 F.3d at 103 (relying on a case that relies on the commentary); *Bethancourt*, 65 F.3d at 1081 (same); *Felton*, 55 F.3d at 864 (relying on cases that rely on the commentary).

U.S.S.G. § 3B1.1, app. n.4.  But none of those cases engaged in the *Kisor* process.  *See Kisor*, 139 S. Ct. at 2415–18.  They did not exhaust the traditional tools of construction to conclude that § 3B1.1 was genuinely ambiguous.  *See id.* at 2415.  Nor did any of those cases determine that the Commission's interpretation was a reasonable reading within § 3B1.1's zone of ambiguity.  *See id.* at 2416.  And they did not examine the character and context of the Commission's interpretation.  *See id.* at 2416–17.  Without that now-essential analysis, the binding nature of those cases' interpretations of § 3B1.1(a) no longer perseveres, and the Guideline must be reevaluated under the *Kisor* process.  That starts with conducting the genuine-ambiguity analysis using the traditional tools of construction to examine the text, structure, purpose, and history of § 3B1.1(a).

### 1.  *Text*

Words and phrases in the text of Guideline § 3B1.1(a) inform the meaning of the organizer-leader enhancement.  The Guideline increases the offense level by four points if a defendant is an organizer or leader of extensive criminal activity:

> If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

U.S.S.G. § 3B1.1(a).  Neither that subsection nor any other part of the Guidelines specifically defines the terms 'organizer' and 'leader.'  Also, because those words are not terms of art, they take on their "ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995); *Abraham v. St. Croix Renaissance Grp., L.L.L.P.*, 719 F.3d 270, 277 (3d Cir. 2013).  To discern the common ordinary meaning of those terms at the time of § 3B1.1's promulgation, it is permissible to consult contemporary dictionaries.  *See, e.g.*, *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070–71 (2018); *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014);

*Del. Cnty., Pa. v. Fed. Hous. Fin. Agency*, 747 F.3d 215, 221 (3d Cir. 2014).

At the outset, several dictionary definitions for the terms 'organizer' and 'leader' do not fit the context of the organizer-leader enhancement. As used in § 3B1.1(a), those terms apply to a "defendant," convicted "of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In that setting, it makes no sense to read the term 'organizer' as referring to, for instance, "a notebook in which correspondence [or] papers . . . are sorted by subject, date, or otherwise, for systematic handling."[6] Nor is it sound to interpret the term 'leader' as meaning "a primary or terminal shoot of a plant."[7]

After excluding those and other contextually inappropriate definitions, the remaining dictionary definitions of 'organizer' and 'leader' provide a foundation for the meaning of those terms as used in § 3B1.1(a). An 'organizer' generally meant "one that organizes."[8] And 'organize' had several related, relevant definitions that all centered around generating a coherent functional structure through the coordination of individual effort.[9] Also, as commonly understood, the term

---

[6] Random House Dictionary of the English Language 1365 (1987) (hereinafter 'Random House').

[7] Webster's Third New International Dictionary 1283 (1986) (hereinafter 'Webster's Third').

[8] Webster's Third 1590; *see also* Random House 1365; Webster's New World Dictionary 1002 (1986); Ninth New Collegiate Dictionary 831 (1986).

[9] *See* Webster's Third 1590 (defining 'organize' as "to arrange or constitute into a coherent unity in which each part has a special function or relation," "to unify into a coordinated functioning whole [or to] put in readiness for coherent or cooperative action," "to set up an administrative and functional

'leader' referred to "a person who by force of example, talents, or qualities of leadership plays a directing role [or] wields commanding influence."[10]

Other textual aspects of § 3B1.1(a) illuminate the meaning of 'organizer' and 'leader.' The Guideline precedes those terms with the indefinite article, "an." That suggests that § 3B1.1(a) is not seeking to identify a single person as organizer or leader – as would be the case if the Guideline included a definite article to read '*the* organizer or leader.' Instead, through the indefinite article, § 3B1.1(a) allows the possibility that multiple persons engaged in the same criminal activity could qualify as organizers or leaders. Also, the Guideline joins the terms 'organizer' and 'leader' by the conjunction, 'or,' which most commonly functions to indicate either "an alternative between different or unlike things, states, or actions"[11] or a "choice between alternative things, states, or courses."[12] Under either of those meanings, the use of 'or' to link 'organizer' and 'leader' would mean that those concepts were dissimilar, if not alternatives to one another. But 'or' also has a different meaning: it can indicate "the synonymous, equivalent, or substitutive character of two words or

_____

structure for [or to] provide with or establish as an organization," and "to arrange by systematic planning and coordination of individual effort").

[10] Webster's Third 1283.

[11] Webster's Third 1585 (providing examples of this meaning such as "wolves [or] bears are never seen in that part of the country"; "sick [or] well, he should not be here"; and "eat [or] go hungry is all the same to him).

[12] Webster's Third 1585 (providing examples of this meaning such as "will you have tea [or] coffee"; and "decide to study medicine [or] law"; and "to be, [or] not to be: that is the question").

phrases,"[13] or even a "correction or greater exactness of phrasing or meaning."[14] *See Honig v. Doe*, 484 U.S. 305, 334 (1998) (Scalia, J., dissenting) (identifying the multiple common definitions of the term 'or'). Under those meanings, the terms 'organizer' and 'leader' would either be synonymous, or the subsequent term, 'leader' would provide greater exactness to the meaning of the term 'organizer.' But under their common ordinary meaning, the terms 'organizer' and 'leader' were neither synonyms nor alternatives; thus, the first definition of 'or' as a disjunctive conjunction befits § 3B1.1(a). *See United States v. Tejada-Beltran*, 50 F.3d 105, 112 (1st Cir. 1995).[15] Thus, in the context of § 3B1.1(a), multiple persons may qualify as organizers or leaders of extensive criminal activity, and a criminal defendant could be an organizer, a leader, or both.

## 2. *Structure*

The structure of Guideline § 3B1.1 also affects the meaning of the organizer-leader enhancement. The most telling aspect of the Guideline's structure is that it provides three distinct enhancements for having an aggravating role in a criminal offense. Subsection (a) contains the most severe of those enhancements, the four-point increase for organizers and leaders of extensive criminal activity. *See* U.S.S.G. § 3B1.1(a). Subsection (b) provides a three-point increase for being "a manager or supervisor (but not an organizer or leader)

---

[13] Examples of this meaning include "fell over a precipice [or] cliff"; "the off [or] far side"; and "lessen or abate." Webster's Third 1585.

[14] Examples of this meaning include "these essays, [or] rather rough sketches"; "the present king had no children – [or] no legitimate children." Webster's Third 1585.

[15] *See also United States v. Wardell*, 591 F.3d 1279, 1304 (10th Cir. 2009); *United States v. Reneslacis*, 349 F.3d 412, 417 (7th Cir. 2003).

14

and the criminal activity involved five or more participants or was otherwise extensive." *Id.* § 3B1.1(b). Subsection (c) provides a two-point enhancement for "an organizer, leader, manager, or supervisor in any criminal activity other than described in [subsections] (a) or (b)." *Id.* § 3B1.1(c).

That structure, coupled with subsection (b)'s specification that organizers and leaders are exclusive of managers and supervisors, gives additional dimension to those terms. The greater enhancement for organizers and leaders in subsection (a) suggests that they have greater culpability than managers[16] or supervisors.[17] *See* U.S.S.G. Ch. 1, Pt. A, Subpt. 1 (citing the principle of just deserts – that "punishment should be scaled to the offender's culpability" – as one philosophy informing the Guidelines). That structural difference provides insight into distinguishing 'leader' from the related terms 'manager' and 'supervisor.' To be more

---

[16] The term 'manager' referred to a person with oversight over operations or other persons. *See* Webster's Third 1372("[A] person that conducts, directs, or supervises something."); *Manager*, *Black's Law Dictionary* (6th ed. 1990) ("A person chosen or appointed to manage, direct, or administer the affairs of another person or of a business, sports team, or the like."); Random House 1166–67 ("[A] person who has control or direction of an institution, business, etc., or of a part, division, or phase of it.").

[17] The term 'supervisor' also referred to a person with oversight over operations or other persons. *See* Webster's Third 2296 ("[O]ne that supervises a person, group, department, organization, or operation."); *Supervisor*, *Black's Law Dictionary* (6th ed. 1990) ("In a broad sense, one having authority over others, to superintend and direct."); Random House 1911 ("[A] person who supervises workers or the work done by others; superintendent.").

culpable than a manager or supervisor, a leader must have a greater degree of operational control over criminal activity.

Another aspect of comparative structure of subsections (a) and (b) presents a minor wrinkle: contrary to the consistent-usage canon,[18] the term 'or' is used differently in those subsections. In subsection (a), the term 'or' joins *separate* concepts, 'organizer' and 'leader.' *See* U.S.S.G. § 3B1.1(a). *But see* U.S.S.G. § 3B1.1, app. n.4 (failing to distinguish between 'organizer' and 'leader'). By contrast, in subsection (b), the 'or' conjunction links *similar* terms, 'manager' and 'supervisor.' *See* U.S.S.G. § 3B1.1(b). But the consistent-usage canon is not absolute. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) ("Although we generally presume that 'identical words used in different parts of the same act are intended to have the same meaning,' the presumption 'is not rigid,' and 'the meaning [of the same words] well may vary to meet the purposes of the law.'" (quoting *Atl. Cleaners & Dryers, Inc. v. United States*, 286 U.S. 427, 433 (1932) (alteration in original))).[19] Rather, the canon applies most powerfully to specialized terms of art. *See, e.g.*, *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*,

---

[18] *See generally Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012) ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning."); *United States v. Sims*, 957 F.3d 362, 365 (3d Cir. 2020) (applying the canon of presumption of consistent usage in interpreting the Guidelines).

[19] *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("Though one might wish it were otherwise, drafters more than rarely use the same word to denote different concepts, and often (out of a misplaced pursuit of stylistic elegance) use different words to denote the same concept.").

7 F.4th 50, 57 (2d Cir. 2021) (quoting *Md. Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997) ("[T]erms in a document, especially terms of art, normally have the same meaning throughout the document."). And the everyday word 'or' is not a term of art. Also, the frequency of the use of the word 'or' in the English language along with its lack of ready synonyms further excuses its different uses in subsections (a) and (b).

### 3. *Purpose*

In the background commentary for Guideline § 3B1.1, the Commission identified the purpose for the aggravating-role enhancement. The Commission intended that the offense level "should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1 Background. To effectuate that purpose, organizers and leaders of extensive criminal activity should have greater responsibility for the offense than managers and supervisors – a conclusion consistent with the structure of Guideline § 3B1.1.

### 4. *History*

The history of Guideline § 3B1.1 does little to clarify the meaning of 'organizer' or 'leader.' The Commission promulgated § 3B1.1 in 1987 and has not amended it.[20] Without any intervening amendments, there is no basis to consider revisiting the dictionary definitions of 'organizer' and 'leader' from the time of § 3B1.1's promulgation.

---

[20] The Commission did amend its interpretive commentary twice in that period. *See* U.S.S.G. § 3B1.1 (1991); U.S.S.G. § 3B1.1 (1993).

17

### C. The Traditional Tools of Construction Yield Definitive Meanings for the Terms 'Organizer' and 'Leader.'

The text, structure, purpose, and history of Guideline § 3B1.1 compel the conclusion that the terms 'organizer' and 'leader' are not genuinely ambiguous. The common ordinary meanings of those terms at the time of promulgation together with the structure and purpose of § 3B1.1 lead to contextually appropriate definitions of those terms. As used in § 3B1.1, an 'organizer' is a person who generates a coherent functional structure for coordinated criminal activity. Similarly, in § 3B1.1, a 'leader' is a person with high-level directive power or influence over criminal activity. Without a genuine ambiguity, the multi-factor test in the commentary, *see* U.S.S.G. § 3B1.1, cmt. 4, is not controlling. Nor do labels, such as 'kingpin' or 'boss,' provide deep insight into the applicability of the organizer-leader enhancement. *Cf. id.* (explaining that "titles such as 'kingpin' or 'boss' are not controlling"). Rather, a defendant who meets the definition of an 'organizer' or 'leader' qualifies for the four-point enhancement.

### D. The District Court's Factual Findings Support the Application of the Organizer-Leader Enhancement.

Applying the post-*Kisor*, post-*Nasir* understanding of § 3B1.1(a) to the District Court's factual findings, which are not clearly erroneous, reveals that Adair qualified for the organizer-leader enhancement. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (explaining that clear error requires a "definite and firm conviction that a mistake has been committed." (citation omitted)); *see also United States v. Igbonwa*, 120 F.3d 437, 440–41 (3d Cir. 1997).

The record contains evidence that Adair was an organizer. She set up a network in which persons obtained prescriptions,

18

filled those, and then coordinated with her to distribute pills. She used her self-described "potent" "hustle skills" to recruit persons to obtain those prescriptions, and at one point, she had twelve people, including her mother and sister, doing so. Tr. of Antoinette Adair Phone Call to William Richardson (App. 98). As she saw herself, she was a "producer" who set up the operation. Tr. of Antoinette Adair Phone Call to William Richardson (Mar. 12, 2016) (App. 224–25). Because her efforts gave functional structure to a coordinated opiate distribution scheme that involved at least five participants, Adair qualifies as an organizer. *See* U.S.S.G. § 3B1.1(a).

The District Court's application of the organizer-leader enhancement can also be sustained on the ground that Adair was a leader of extensive criminal activity. Although the terms 'organizer' and 'leader' are separate, they are not wholly distinct, and when an organizer retains control over the functional structure for criminal activity that he or she coordinated, that evidences high-level directive power or influence over criminal activity needed for the leader enhancement. Not only did Adair retain control over the prescription-pill scheme that she coordinated, but also she made high-level decisions essential to its continued operation. When she learned that the physician who wrote prescriptions for her suppliers "was going down," she found another doctor to do so. Tr. of Antoinette Adair Phone Call to William Richardson (App. 98). In addition, Adair decided when and where sales would occur, and she often coordinated drug sales with various men whom she oversaw like sons. She had an elevated position in the criminal activity and used others to chauffeur her during drug deliveries and to serve as her bodyguards. To maintain her operation, Adair would occasionally front pills to another drug dealer in the area or throw in extra pills for free when he could not afford everything she had to sell. Adair also arranged sales to her customers from other drug dealers when she had no pills to sell. And she took measures to preserve her operations: on at least

19

one occasion, when she was not paid in full, she threatened a group of buyers at gunpoint.

Adair counters that she was simply a broker or a mere middleman in a larger criminal enterprise. Some of her conduct is consistent with those roles. She nurtured and protected her relationships with her suppliers by, in her words, "[w]ining and dining em, and taking care of their kids." Tr. of Antoinette Adair Phone Call to William Richardson (App. 98). And Adair was not the largest drug dealer in town; she worked with another dealer who oversaw a much larger distribution network. But having those client-management skills and a relationship with a larger-scale drug dealer does not preclude Adair from also being a leader. To the contrary, those factors, together with her strategic operational decisions confirm the high-level control that she had over the prescription-pill scheme that she organized. For these reasons, the § 3B1.1(a) four-point enhancement could also be sustained on the ground that Adair was a leader.

## II. The Additional One-Point Reduction for Acceptance of Responsibility Under Guideline § 3E1.1(b)

As a separate challenge to the calculation of her offense level, Adair argues that the government should have moved for an additional one-point reduction for acceptance of responsibility. The District Court decreased Adair's offense level by two points under § 3E1.1(a) upon finding that she had accepted responsibility for her offenses. But the government did not move under § 3E1.1(b) to reduce Adair's offense level by a third point for acceptance of responsibility. The government withheld that motion because Adair disputed certain sentencing enhancements, such as the four-point increase for being an organizer or leader. Adair now argues that the government impermissibly withheld the § 3E1.1(b) motion and that the District Court should have compelled the government to move for an additional one-point acceptance-

20

of-responsibility reduction.  Her challenge fails for the reasons below.

### A. Argument Preservation and the Standard of Review

As an initial matter, the parties dispute whether Adair preserved the § 3E1.1(b) argument in District Court, and preservation affects the standard of appellate review.  *See* Fed. R. Crim. P. 51(b) (explaining that a party may preserve an argument by objecting and stating the basis for the objection); *United States v. Joseph*, 730 F.3d 336, 337 (3d Cir. 2013).  If Adair preserved her acceptance-of-responsibility argument, then on appeal, legal issues are examined *de novo*, and factual findings are reviewed for clear error.  *See United States v. Williams*, 344 F.3d 365, 379 (3d Cir. 2003).  But if she did not, then to prevail, she must meet the four requirements of plain-error review.  *See United States v. Greenspan*, 923 F.3d 138, 147 (3d Cir. 2019).

The plain-error standard, however, is not entirely distinct from the other standards of appellate review.  The first prong of plain-error review examines whether a district court erred.  *See United States v. Jabateh*, 974 F.3d 281, 298 (3d Cir. 2020) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).  For purposes of that prong, the difference between preserved and unpreserved error is immaterial: in either circumstance, an appellate court uses the standard of review that would have applied had the argument been preserved.  For example, if a preserved argument would receive *de novo* review, then the first prong of the plain-error standard would evaluate error *de novo*.  Similarly, if a preserved argument would be reviewed under a more deferential standard, such as clear error or abuse of discretion, then the more deferential standard would apply to the first prong of the plain-error standard for an unpreserved argument.  *See, e.g.*, *United States v. Kolodesh*, 787 F.3d 224, 239 & n.19 (3d Cir. 2015); *United States v. Fitch*, 659 F.3d

21

788, 797 n.7 (9th Cir. 2011).[21]  Thus, the real effect of unpreserved error comes not from the first plain-error prong but rather from the latter three prongs, which do not apply to preserved arguments and which require an appellant to make additional showings of plainness, effect on substantial rights, and serious effect on the fairness, integrity, or public reputation of judicial proceedings. *See generally Olano*, 507 U.S. at 732–36.  But if there is no error, then the latter three prongs are of no consequence, and a challenge fails regardless of whether it was preserved.

Those principles apply here.  As explained below, the District Court did not err in declining to compel the government to move for an acceptance-of-responsibility reduction.  Because there was no error, it is unnecessary to decide the preservation issue: regardless of whether Adair preserved her argument, she cannot prevail.

### B. Guideline § 3E1.1 Before and After Legislative Amendment

Adair's challenge focuses on the meaning and scope of Guideline § 3E1.1, which allows for a downward adjustment when a defendant accepts responsibility for an offense.  That Guideline has been modified several times since its initial promulgation by the Commission in 1987, and some of those amendments are significant here.

In its original form, Guideline § 3E1.1 allowed a sentencing court to reduce a criminal defendant's offense level by two points upon a defendant's clear demonstration of "a

---

[21] If the error prong of the plain-error standard did not mirror the underlying standard of review for preserved error but instead always evaluated error *de novo*, then that could incentivize a party to refrain from preserving an argument in instances where the standard of review for preserved error would be more deferential than *de novo* review.

recognition and affirmative acceptance of personal responsibility for the offense of conviction." U.S.S.G. § 3E1.1(a) (1987). The Commission issued five interpretive comments as application notes to the original version of § 3E1.1 to guide the determination of whether a defendant accepted responsibility for an offense.

But the Commission must periodically review and revise the Guidelines, *see* 28 U.S.C. § 994(o), so they are not necessarily constant over time. To amend the Guidelines, the Commission first must follow a notice-and-comment rulemaking process. *See id.* § 994(x); *see also United States v. Riccardi*, 989 F.3d 476, 484 (6th Cir. 2021); *see generally* 5 U.S.C. § 553(b)–(c). Next, the Commission must notify Congress of the proposed revisions to the Guidelines. *See* 28 U.S.C. § 994(p). If, after 180 days, Congress does not disapprove or modify the proposed amendments, they then take effect. *See id.* § 994(p); *Stinson*, 508 U.S. at 41 ("Amendments to the guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them.").

Through this process, in 1992, the Commission amended Guideline § 3E1.1 to allow an additional one-point acceptance-of-responsibility reduction. *See* U.S.S.G. § 3E1.1(b) (1992); U.S.S.G. app. C amend. 459 (effective Nov. 1, 1992). Under that new provision, codified in subsection (b), the sentencing court could decrease the offense level by one additional point if it made three supplemental determinations. Those required findings were that the defendant (i) qualified for the two-point acceptance-of-responsibility reduction; (ii) had an offense level of 16 or greater; and (iii) "assisted authorities in the investigation or prosecution of his own misconduct." U.S.S.G. § 3E1.1(b) (1992). For that third requirement, the 1992 Amendments specified two ways to demonstrate assistance to authorities: timely provision of complete information to the

government about a defendant's involvement in the offense,[22] or timely notice of a defendant's intention to plead guilty.[23] As guidance for the additional one-point reduction, the Commission issued a sixth application note to its interpretive commentary. *See id.* § 3E1.1, cmt. n.6 (describing subsection (b) and explaining the significance of timeliness to both subsections (b)(1) and (b)(2)).[24]

In late 2001 and early 2002, the Commission attempted to amend § 3E1.1 again. *See* Sentencing Guidelines for United States Courts, 66 Fed. Reg. 59330, 59337–38 (Nov. 27, 2001). The Commission proposed retracting one of the additions from the 1992 Amendments by eliminating the complete-information basis for demonstrating assistance to authorities. *See id.*; *see also* U.S.S.G. § 3E1.1(b)(1) (1992). It explained that a reduction on that ground "undermines the incentive to plead guilty . . . because the defendant can receive the reduction even if the defendant has caused the government and the court to devote substantial resources to preparing the case for trial." Sentencing Guidelines for United States Courts, 66 Fed. Reg. 59330, 59337 (Nov. 27, 2001). With the elimination of that option, the third-point reduction for acceptance of responsibility would be available only for timely notice of an intention to plead guilty. According to the Commission, that would "save both judicial and governmental resources by providing defendants a stronger incentive to timely plead guilty." *Id.*

---

[22] *See* U.S.S.G. § 3E1.1(b)(1) (1992).

[23] *See id.* § 3E1.1(b)(2).

[24] In addition to adding Application Note 6, the Commission also amended Notes 1 through 5 in ways not relevant here.

After completing the notice-and-comment process,[25] the Commission held a public meeting to determine whether to submit the proposed amendment to Congress. *See* Notice of Public Meeting of the United States Sentencing Commission (Apr. 5, 2002).[26] At that meeting, however, a Vice Chair of the Commission opposed the motion to amend Guideline § 3E1.1(b), and it did not receive a second vote. *See id.* Without a successful motion, the Commission did not submit the proposed amendment to Congress and did not promulgate the amendment. *See id.*

In 2003, Congress addressed that failed amendment through § 401 of the PROTECT Act. That legislation amended Guideline § 3E1.1(b) to delete the complete-information basis for the third-point acceptance-of-responsibility reduction. *See* Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, § 401(g), 117 Stat. 650, 671 (2003); *cf.* U.S.S.G. § 3E1.1(a)(1) (1992).

But § 401 went further than the Commission's failed proposal. Section 401 also effectuated a structural change to the third-point acceptance-of-responsibility reduction. Before the § 401 amendments, the *sentencing court* decided the appropriateness of the additional one-point reduction. *See United States v. Drennon*, 516 F.3d 160, 161 (3d Cir. 2008); U.S.S.G. § 3E1.1 (1992). As revised by § 401, Guideline

---

[25] The time for comments was extended because, before the initial time for public comments had expired, the Commission issued a second notice of proposed amendments pertaining to § 3E1.1(b) to correct a technical error in the initial proposed amendment – the inadvertent deletion of the word 'timely' from subsection (b)(2). *See* Sentencing Guidelines for United States Courts, 67 Fed. Reg. 2456 (Jan. 17, 2002).

[26] Available at https://www.ussc.gov/policymaking/meetings-hearings/notice-april-5-2002 (last visited June 28, 2022).

§ 3E1.1(a) conditions the extra one-point reduction upon a motion by the *government*. *See* PROTECT Act § 401(g)(1)(A). Section 401 further specified the necessary contents for the government's motion: it must state that the defendant "timely notif[ied] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." *Id.* § 401(g)(1)(B). Section 401 also added one sentence to Application Note 6, underscoring that a motion by the government was necessary for the third-point reduction for acceptance of responsibility:

> Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, *an adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing.*

*Id.* § 401(g)(2)(B) (emphasis added). Finally, to preserve these modifications from later periodic revision by the Commission, § 401 expressly prohibited the Commission from altering or repealing the legislative amendments to the acceptance-of-responsibility reduction:

> At no time may the Commission promulgate any amendment that would alter or repeal the amendments made by subsection (g) of this section.

*Id.* § 401(j)(4); *see also id.* § 401(g) (amending § 3E1.1(b) and Application Note 6).

Despite that congressional command, about ten years later, the Commission promulgated Amendment 775. That amendment added a sentence to Application Note 6 that limited the government's discretion for withholding a § 3E1.1 motion:

The government should not withhold such a motion based on interests not identified in § 3E1.1, such as whether the defendant agrees to waive his or her right to appeal.

U.S.S.G. § 3E1.1, cmt. n.6 (2013); U.S.S.G. app. C amend. 775 (effective Nov. 1, 2013). The Commission relied on legislative silence to justify Amendment 775:

In its study of the PROTECT Act, the Commission could discern no congressional intent to allow decisions under § 3E1.1 to be based on interests not identified in § 3E1.1.

Sentencing Guidelines for United States Courts, 78 Fed. Reg. 26425, 26432 (May 6, 2013). In adding that commentary to Note 6, the Commission did not address whether Amendment 775 conflicted with § 401's prohibition on modifying U.S.S.G. § 3E1.1.

### C. Amendment 775 Does Not Control § 3E1.1(b) Motions.

Adair's challenge to the third-point reduction rests on Amendment 775. She argues that the government violated Amendment 775 by withholding a § 3E1.1(b) motion for reasons other than the timeliness of her guilty plea. If Amendment 775 validly restricts prosecutorial discretion, then Adair would be correct. But for three independent reasons, Amendment 775 is not controlling.

First, Amendment 775 violates § 401(j)(4) of the PROTECT Act, which prevents the Commission from altering or repealing Congress's amendments to § 3E1.1(b). The § 401 amendments identify only one circumstance in which the government can move for the third-point reduction for acceptance of responsibility: a defendant's timely notice of an intention to enter a guilty plea. *See* PROTECT Act § 401(g)(1)). But the § 401 amendments do not compel the

27

government to make such a motion under that circumstance – or any other. *See id.* Thus, the § 401 amendments leave the decision to make a § 3E1.1(b) motion to the government's discretion. *See Drennon*, 516 F.3d at 162–63. Amendment 775 trespasses into that field of discretion by allowing the government to withhold such a motion only when a defendant does not give timely notice of an intention to enter a guilty plea. *See* U.S.S.G. § 3E1.1, cmt. n.6; U.S.S.G. app. C amend. 775 (effective Nov. 1, 2013). Limiting when the government can withhold a motion to only that circumstance is just another way of requiring the government to make a § 3E1.1(b) motion upon a defendant's timely notice of an intention to plead guilty. Because the § 401 amendments lack such a requirement, Amendment 775 imposes an additional condition in violation of § 401(j), which prohibits the Commission from altering the congressional amendments. *See* PROTECT Act § 404(j)(4); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374–75 (1986) ("To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress."). Accordingly, the commentary added by Amendment 775 has no force of law and is not controlling. *See LaVallee Northside Civic Ass'n v. V.I. Coastal Zone Mgmt. Comm'n*, 866 F.2d 616, 623 (3d Cir. 1989) ("[A]n administrative agency's regulation that conflicts with the parent statute is ineffective."); *see also Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1450 (D.C. Cir. 1994) ("An agency can neither adopt regulations contrary to statute nor exercise powers not delegated to it by Congress.").

Second, Amendment 775 exceeds the Commission's delegated powers. Through the commentary added by Amendment 775, the Commission purports to govern the discretion of a cabinet-level agency – the Department of Justice and each of its prosecuting component agencies – with respect to the third-point reduction for acceptance of responsibility. Yet nothing in Congress's delegation of "significant discretion" to the Commission, *Mistretta v. United States*,

28

488 U.S. 361, 377, 379 (1989), suggests that the Commission has power greater than the Attorney General such that it may direct the exercise of the Department of Justice's prosecutorial discretion. *Compare* 28 U.S.C. § 994(b)(1) (directing the Commission to develop a system of sentencing ranges "for each category of offense involving each category of defendant"), *with* 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."). For this reason as well, Amendment 775 has no force of law.

Third, even overlooking its other fatal shortcomings, Amendment 775 would still not merit controlling weight. The Guideline that Amendment 775 attempts to interpret, § 3E1.1(b), is atypical because Congress, not the Commission, authored it. Thus, Guideline § 3E1.1(b) falls outside of the *Stinson* paradigm and is not a candidate for *Auer* deference. Even still, Amendment 775 would not qualify for controlling deference under any framework because the Commission did not invoke its data-driven expertise on criminal sentencing. Instead, Amendment 775 represents the Commission's legal interpretation of Guideline § 3E1.1(b). And an agency's application of the canons of construction does not receive controlling deference. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[I]f the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law."); *see also Kisor*, 139 S. Ct. at 2417 (explaining that to receive *Auer* deference, "the agency's interpretation must in some way implicate its substantive expertise"). Because Amendment 775 is not the product of agency subject-matter expertise, but rather the Commission's

application of the traditional tools of construction, Amendment 775 cannot receive controlling deference.[27]

Several of our sister circuits have nonetheless treated Amendment 775 as controlling.[28] Even apart from the reasons above, which none of those courts contemplated, Amendment 775 cannot have any traction in this Circuit. That is so because, *before* the Commission issued Amendment 775, this Court, in *United States v. Drennon*, 516 F.3d 160 (3d Cir. 2008),

---

[27] Even if an agency could receive controlling deference for its application of the canons of construction, the Commission's interpretation of § 3E.1.(b) still would not merit such deference. It drew a negative inference from legislative silence: the absence of congressionally specified criteria for initiating § 3E1.1(b) motions led the Commission to infer that the sole criterion for such a motion was timely notice of an intention to plead guilty. *See* Sentencing Guidelines for United States Courts, 78 Fed. Reg. 26425, 26432 (May 6, 2013). But reading substance from legislative silence is at best a companion canon; it cannot, on its own, justify an interpretation. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994); *Brown v. Gardner*, 513 U.S. 115, 121 (1994). And here, the Commission did not offer any other support for its construction of Amendment 775. *See* Sentencing Guidelines for United States Courts, 78 Fed. Reg. 26425, 26431–32 (May 6, 2013). Even worse, the Commission did not account for the countervailing inference that Congress, by not specifying any criteria for § 3E1.1(b) motions, sought to permit government decisions based on any legitimate interest.

[28] *See, e.g.*, *United States v. Johnson*, 980 F.3d 1364, 1380–81 (11th Cir. 2020); *United States v. Rivera-Morales*, 961 F.3d 1, 16 (1st Cir. 2020); *United States v. Brockman*, 924 F.3d 988, 994–95 (8th Cir. 2019); *United States v. Rayyan*, 885 F.3d 436, 440–41 (6th Cir. 2018); *United States v. Castillo*, 779 F.3d 318, 322–23 (5th Cir. 2015).

interpreted the PROTECT Act's modifications to § 3E1.1(b). In analyzing the scope of the government's discretion in making a motion under § 3E1.1(b), *Drennon* examined several sources: the text of the amendment, the congressional amendment to Application Note 6, and the Supreme Court's analysis of a textually and structurally similar guideline. *See Drennon*, 516 F.3d at 161–63; *see also Wade v. United States*, 504 U.S. 181, 185–86 (1992) (analyzing the government's discretion in making a substantial-assistance motion under Guideline § 5K1.1). From its consideration of those sources, *Drennon* held that the government can withhold a § 3E1.1(b) motion so long as it does not have an unconstitutional motive for doing so. *See Drennon*, 516 F.3d at 162–63; *see also id.* at 162 ("The relevant text of § 3E1.1(b) tracks that of U.S.S.G. § 5K1.1 which requires a motion from the government before any downward departure may be granted based upon the defendant's cooperation with the government."). Because *Drennon* did not rely on agency deference in interpreting the congressionally enacted Guideline § 3E1.1(b), its construction of that provision cannot be replaced by the Commission's later interpretation in Amendment 775. *See United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487 (2012) (plurality op.) (concluding that because a prior Supreme Court case interpreted a statute without relying on deference principles, no different construction was "available for adoption by [an] agency"); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (explaining that a binding judicial construction of an unambiguous statute "leaves no room for agency discretion."). Put differently, because an agency may not replace a controlling judicial interpretation of an unambiguous statute with its own construction (even if that construction is based on agency expertise), there is no room for Amendment 775 in this Circuit.

### D. The Record Lacks Evidence that the Government Withheld a § 3E1.1(b) Motion for an Unconstitutional Motive.

Because Amendment 775 has no legal force in this Circuit, the only remaining inquiry concerns whether, by withholding the § 3E1.1(b) motion, the government violated *Drennon*'s unconstitutional-motive standard. The government acts with unconstitutional motive when it withholds a § 3E1.1(b) motion based on a defendant's race, religion, or gender, or "when its refusal to move was not rationally related to any legitimate government end." *Drennon*, 516 F.3d at 162–63 (internal quotation marks omitted) (quoting *United States v. Abuhouran*, 161 F.3d 206, 212 (3d Cir. 1998)); *see also Wade*, 504 U.S. at 185–86.

Here, Adair has no evidence, much less evidence amounting to a "substantial threshold showing," that the government acted with an unconstitutional motive. *Wade*, 504 U.S. at 186; *see also id.* (explaining that "a defendant has no right to discovery or an evidentiary hearing unless he make a substantial threshold showing" of an improper motive (internal quotation marks omitted)). Rather, as the government explained, it refused to make the § 3E1.1(b) motion because Adair caused it to have to prepare for a two-day sentencing hearing. The government's position reflects the additional leverage that Congress – as a policy choice – imparted to it through the conferral of discretion over § 3E1.1(b) motions. But using the third-point reduction as a bargaining chip to resolve sentencing disputes is not an unconstitutional motive, and thus Adair cannot prevail in her effort to compel the government to make a § 3E1.1(b) motion.

### CONCLUSION

For the foregoing reasons, we will affirm the judgment of sentence.